# Union Refining Co. *v.* Barton.

### *Action for Breach of Written Executory Contract.*

1. *Contract between manufacturing company and agent for sale of goods, construed; rights and duties of respective parties.*—Under an executory contract between a private corporation, engaged in the business of refining cotton-seed oil at Montgomery, Alabama, and an agent employed to introduce and establish a market for the sale of its oils in Georgia; by which it was stipulated that, for three years, the agent was to have the sole right of selling the company's oils in Georgia, through himselt and his sub-agents, was to pay the expenses of himself and his agents, was to receive as compensation ten per cent. of the amount of his sales, and was to be subject to the orders of the company; *held,* that the company was necessarily bound, in the exercise of good faith in carrying out the objects and purposes of the contract, to furnish the oils with which to fill the agent's contracts; that its orders, to which the agent was subject, related to the matter of making sales, the mode and manner of delivery and payment, and the price to be charged for the oils; that these orders were to be given in good faith, in honest promotion of the common undertaking; and that, in regulating the price, the company was neither required to sell its oils at a loss, nor authorized to raise the price above a fairly remunerative profit, which would defeat or substantially hinder sales, in order to get rid of the agency.

2. *Same; subsequent order as to sales for cash or on credit.*—A letter written by the company to the agent, a few months after the inception of the contract, saying, " In all cases, have buyers remit by post-office order, if possible, on delivery, as we prefer it in all cases, and do not mention thirty days acceptance, except in extreme cases, and be sure they are all good men,"—is not a modification of the contract, but a reasonable order, to which the agent was bound to conform in making future sales; and it authorized him to sell on thirty days time, only when such indulgence was necessary to effect a sale, and only to solvent purchasers.

3. *Same; revocation of license to sell on credit.*—The agent objecting to this restriction, as not authorized by the contract, and replying that he did not guaranty any sales made on credit; a letter then written to him by the company, saying, " Henceforth you are not authorized to sell bills that you do not guaranty," *is* a revocation of the former license *to* sell on thirty days time to solvent purchasers, and takes away the agent's right to sell on credit without becoming himself the guarantor of the bills.

4. *Same; profits as damages.*—In an action for the breach of such contract on the part of the company, the agent can not recover as damages the supposed profits which he would or might have realized from sales during the entire period stipulated for the continuance of the contract. Such damages are entirely speculative, and no rule can be laid down by which they can be accurately ascertained or measured.

5. *Same; assignment of breaches.*—An averment in the complaint, as a breach of the contract, that the company has failed and refused to pay plaintiff the stipulated compensation, is not a ·sufficient assignment, without an additional averment of sales made and their amount; and an averment that the company, after plaintiff had begun to introduce and

[Union Refining Co. v. Barton.]

sell its oils in Georgia under the contract, sent another agent there for that purpose, without the knowledge or consent of plaintiff, is not a sufficient assignment of a breach, without an additional averment that plaintiff was still performing his duties under the contract when the agent was so sent.

6. *Same; proof of sales made.*—The amount of sales made by the plaintiff, while engaged in the business of the agency, is competent evidence for him, as tending to furnish a basis for fixing his compensation for the services rendered, but not as affording a guide for estimating future or prospective profits.

7. *Evidence admissible for one purpose only.*—When evidence is offered which is admissible for one purpose only, it can not be excluded from the jury on motion, but a charge should be asked limiting its effect.

8. *Charge having tendency to mislead; not reversible error.*—A charge given which has a tendency to mislead the jury, is not a reversible error: an explanatory charge should be asked.

APPEAL from the City Court of Montgomery.

Tried before the Hon. THOS. M. ARRINGTON.

This action was brought by John K. Barton, against the Union Refining Company, a private corporation engaged in business in the city of Montgomery ; was commenced on the 18th September, 1882, and sought to recover damages for the defendant's alleged breach of a written contract, which was in these words : "This contract, made and entered into on this 28th day of November, A. D., 1881, by and between the Union Refining Company of Montgomery, Alabama, and John K. Barton, of said State and county, *witnesseth*, that the said Barton undertakes to travel to introduce and sell in the State of Georgia the oil of the said Union Refining Company, of which C. H. Dudley is president, and to take such other means as he may deem advisable for its thorough introduction, at his own expense, and to be subject to the orders of said company. In consideration thereof, the said Union Refining Company agrees to give to said Barton the territory of the State of Georgia, and to pay on all the sales of oil in the said territory a commission of ten per-cent. to the said Barton. The time and terms of this contract are hereby agreed to and made for the term of three years, with the privilege of renewal by consent of both parties at the end of said term. In witness whereof," &c. Signed by both parties.

The complaint alleged the execution of this contract, setting it out in full, and the plaintiff's performance and compliance with all of its stipulations on his part up to the time of the alleged breaches by the defendant, and assigned the following breaches: (1.) "In that said defendant has failed and refused to pay to said plaintiff, on all sales of oil in the State of Georgia, of said company, ten per-cent. commissions, as stipulated in said agreement." (2.) " In that said defendant, after plaintiff had begun to introduce and sell the oil of said company in said

[Union Refining Co. v. Barton.]

State of Georgia, according to the terms of said contract, employed and sent out another person into said State, to introduce and sell its oil, without the knowledge or consent of plaintiff." (3.) "In that said defendant, after plaintiff had begun to introduce and sell the oil of said company in said State of Georgia, according to the terms of said contract, failed and neglected to furnish the oil to fill the sales thereof made by plaintiff in said State." (3½.) "In that said defendant, after plaintiff had entered upon the performance of his part of said contract, failed and refused to allow plaintiff to sell its said oil in said State of Georgia, at a fair and reasonable market price." (4.) "In that said defendant, after plaintiff had entered upon the performance of his part of said contract, refused to furnish and supply its oil to fill the sales thereof made by plaintiff in said State, unless plaintiff would sell such oil at prices sufficiently above the fair market price of such oil in said State to make his ten per-cent. commissions, over and above such market price." (5.) "In that said defendant, after plaintiff had entered upon the performance of his part of said contract, refused to allow plaintiff to introduce and sell its said oil in said State, unless plaintiff would guarantee all sales so made by him." (6.) "In that said defendant, to-wit, in June, 1882, after plaintiff had entered upon the performance of his part of said contract, instructed plaintiff to offer its said oil in the State of Georgia at seventy cents per gallon, while said defendant was at that time offering the same oil in said State at a much lower rate, to various parties in said State," mentioning the names of several persons, "and who were customers of plaintiff in said oil trade." (7.) "In that said defendant, after plaintiff had entered upon the performance of his part of said contract, and without any fault on plaintiff's part, in divers ways so interfered with and obstructed plaintiff in his efforts to introduce and sell the oil of said company in said State, as to prevent plaintiff from further and fully performing said contract for the term specified therein." (8.) "In that said defendant failed and refused to furnish and supply its oil to plaintiff for sale in the State of Georgia according to the terms of said contract, although plaintiff was at all times ready and willing to sell the same."

The defendant demurred to the entire complaint, and to each of the breaches assigned, assigning sixteen grounds of demurrer. The court sustained the demurrer to the 5th and 7th breaches assigned, and those assignments were then amended; and the court also sustained the demurrer assigned to "so much of the complaint as claims damages on account of profits on oil not sold, or "on what the complainant might have made hereafter under said agreement." The defendant then pleaded the general issue, set-off, and the statute of frauds; and the

[Union Refining Co. v. Barton.]

cause was tried on issue joined on these pleas.　On the trial, as the bill of exceptions shows, the plaintiff testified as a witness for himself, that about the 1st December, 1881, immediately after the making of said contract, he went to Atlanta, Georgia, and entered on the performance of his duties under the contract, distributing samples of the defendant's oils, advertising, circulating hand-bills, making sales, and employing local agents to assist him ; that he found he could effect sales more readily, in many cases, by giving credit for thirty days, than by requiring cash in all cases, and so informed the defendant by letter ; that the defendant replied by letter, which was produced, instructing him not to sell on thirty days time except in extreme cases ; that he objected to this restriction, and was then instructed not to sell on credit at all, unless he became himself the guarantor of the bills ; that he was required by the defendant to charge sixty or sixty-five cents per gallon as the retail price of its oils, while the oils from other cities, of as good quality, were sold at fifty-five cents per gallon ; that the defendant failed to fill the orders for oils sent by him, and sometimes furnished oils to his customers directly ; that up to the 16th February, 1882, "he himself sold 192 barrels of oil, but he could not tell how many barrels had been sold by his agents or the company itself, having lost a portion of his order-book ; and that at the time he was recalled and stopped from selling by said Dudley, the president of said company, the sales averaged three or four hundred barrels per month."　The defendant objected to this evidence, as to the amount of sales made by the defendant, " on the ground that it was illegal and irrelevant ;" and duly excepted to the overruling of said objections.　The letters above mentioned are copied in the opinion of the court.　The defendant objected to their admission as evidence, and excepted to the overruling of said objections ; and numerous other exceptions were reserved to the rulings of the court in admitting evidence, which require no special notice.

The court charged the jury, " of its own motion," as follows : "If it appears to your satisfaction, from the evidence, that the contract was kept on the part of plaintiff, and that it was broken on the part of the defendant as alleged in the complaint, the plaintiff would be entitled to damages : he would be entitled to recover the actual damages sustained up to the month of February, 1882." [This date was agreed on by consent, if the court should hold the plaintiff entitled to recover at all.] " *The value of his rights under the contract would be the measure of his recovery.　In arriving at their value, it would be proper for you to consider the terms of the contract, the length of time it had to run, and, if shown by the evidence, the extent of the sales*

*the plaintiff had made, and was making at the time of the breach, together with all the other circumstances in evidence.* If you are of opinion, from all the evidence, that the plaintiff's rights under the contract, at the time of the breach, were in fact of no pecuniary value, then he would be entitled to nominal damages only." To each of the italicized sentences of this charge the defendant duly excepted.

The court further charged the jury, of its own motion, as follows: "If the evidence shows that the oil referred to in the contract was a cash article, then the plaintiff could, under the contract, make cash sales only. If the defendant at any time gave him authority, verbal or written, to make sales on time, the defendant could have withdrawn such authority at pleasure. *But, if the evidence shows that the defendant did give plaintiff such authority, and, while plaintiff was exercising the same, did not withdraw it, but informed plaintiff that he would be required to guarantee all such sales, such requirement, if it embarrassed plaintiff in his operations, and prevented him from making sales, was a breach of the contract.*" To the italicized portion of this charge the defendant duly excepted.

The defendant also excepted to several charges given by the court at the instance of the plaintiff, among which were the following: (3.) "If the jury find, from the evidence, that the defendant has broken its contract with plaintiff, in respect of any or either of the alleged breaches set forth in the complaint, original or amended, whereby the plaintiff has been injured or damaged, then the measure of damages plaintiff is entitled to recover, as shown by the evidence, is the injury and damage he has sustained by such breach, from the time he is shown by the evidence to have entered on the performance of the contract, until the first day of February, 1883, and what the value of said contract would have been to him during the whole of said period, if it had not been broken by the defendant." (6.) "If the jury believe, from the evidence, that the defendant has failed or refused to pay to plaintiff ten per-cent. commissions on all sales of oil manufactured or refined by the defendant, and sold in Georgia, between the 28th day of November, 1881, and February, 1883; then said failure was and is a breach of said written contract offered in evidence, and plaintiff is entitled to recover of defendant such damages as he has shown by the evidence he may have sustained by such breach." (8.) "If the jury believe, from the evidence, that the one hundred barrels of the defendant's oil shown by the evidence to have been sold to Chess, Carles & Co., or any part thereof, was so sold in consequence of, or as the result of plaintiff's negotiations in Atlanta, Georgia, with the general agent of said firm, then the plaintiff is entitled to recover commissions on such portion of

[Union Refining Co. v. Barton.]

said one hundred barrels as the evidence shows was shipped into Georgia; provided the jury further believe, from the evidence, that the defendant, under all the circumstances of said transaction, as shown by the evidence, either knew, or ought to have known, that said sale of oil was in consequence of, or the result of plaintiff's negotiations with said agent; and provided, also, the jury further find from the evidence that the defendant has never paid plaintiff any commissions on such portion of said oil as they may find was so shipped into Georgia."

The rulings of the court on the pleadings, adverse to the defendant, the several rulings on evidence to which exceptions were reserved, the charges given, and the refusal of charges asked, are now assigned as error, making in all fifty-five assignments of error.

ARRINGTON & GRAHAM, for appellant, insisting on each of the assignments of error, cited the following authorities: (1.) That none of the breaches assigned in the complaint justified a rescision of the contract by the plaintiffs—Addison on Contracts, § 360; *Rankin v. Darnell*, 11 B. Monroe, 30, or 52 Amer. Dec. 557. (2.) That the damages claimed were remote, uncertain, and speculative—*Pollak & Co. v. Gantt*, 69 Ala. 373; *Howe Machine Co. v. Bryson*, 44 Iowa, 159, or 24 Amer. Rep. 735; *Griffin v. Culver*, 16 N. Y. 489; Wait's Actions & Defenses, vol. 2, p. 443; *French v. Ramage*, 2 Nebr. 254; *Burton v. Holley*, 29 Ala. 318; *Sims v. Glazener*, 14 Ala. 695; *Bolling v. Tate*, 65 Ala. 417; *Washburn v. Hubbard*, 6 Lansing, N. Y. 11; *Olmstead v. Burke*, 25 Illinois, 86; *Masterson v. Mt. Vernon*, 58 N. Y. 391.

BRAGG & THORINGTON, *contra*, cited the following authorities: Code of 1876, Forms 10 and 11, pp. 702–03; *Livingston v. Pippin*, 31 Ala. 542; *Boylston v. Sherran*, 31 Ala. 538; 36 Ala. 61; 8 Ala. 234; 7 Hill, N. Y. 61; 14 Mich. 34; 8 Barb. 412; 89 N. Y. 37; 71 N. Y. 118; 7 Cush. Mass. 516; 31 Vt. 582; 33 Vt. 80; 4 Otto, 214; 3 Woods, C. C. 287; 127 Mass. 518; 49 Vt. 304; *United States v. Speed*, 8 Wallace, 84.

STONE, C. J.—The present suit grew out of an executory agreement, containing mutual stipulations. Commencing about the first of December, 1881, it was to continue three years. The business of the corporation—appellant here—was that of refining cotton-seed oil, and the object of the contract was the introduction and establishment of a market for the sale of its oil in the State of Georgia. The agreement was in writing, signed by both parties; and by its terms Barton was constituted traveling agent, with authority to make sales, either through

[*Union Refining Co. v. Barton.*]

himself or agents, to pay his own and agents' expenses of every kind, and to have for his compensation ten per-cent. of the amount of his sales. He was to have the sole right of selling in Georgia; but was subject to the orders of the company. The refining company was necessarily bound to furnish the oil with which to fill Barton's contracts. The contract is very general in its expressed provisions, and, hence, many of the duties it imposes are left to the usages of such trade, if there be such, and to implications springing out of the nature of the transaction. There is no testimony of any usage in such dealings, and we need not consider that question.

What are the implications? Barton bound himself to give the service his time, his energy, and a faithful effort to make sales, and to establish a trade and market for the company's oils; and all this, in the best good faith, for the promotion of the company's interests. Save his stipulated compensation of ten per-cent., he could have no aim or interest in antagonism to the interest of the company. He must defray all expenses incident to the agency, and, in this matter, could call on the company for no assistance. He was to be subject to the orders of the company. This must relate to the matter of making sales, for there is nothing else for it to relate to. This would embrace the mode and manner of payment, and the matter of delivering the goods when sold, and also the question of price, under rules to be presently stated. He must sell for cash, unless this is varied by a usage of trade, or by authority from his principal.

The implied duties resting on the refining company were equally binding on it. They, too, must have been performed in the best of good faith, in honest promotion of the common aim to establish the desired trade. Barton was subject to the company's orders; but those orders must have been given in promotion of the enterprise, not to thwart its purposes. They could stipulate the price at which their oils should be sold, and, in doing so, could take into the account the cost of production, and the rates of their home, or other accessible markets, if such were available. If, by force of competition of an equal, or inferior grade of goods, or by cutting of rates, they could not enter into the market without a loss, the contract imposed on them no obligation to so scale down their prices, as to leave them without a reasonable profit on their merchandise. The contract was conceived in the spirit of mutual benefit. On the other hand, the contract, in its spirit, required that the price of the goods should not be raised so far above remunerative prices, as to defeat, or substantially hinder sales. Nor could the price be raised above rates which would yield a reasonable profit, as a means of getting rid of Barton's agency. And the company

was bound, with no undue delay, to perform Barton's contracts of sale. This, for the common benefit of both parties, and in the true spirit of the contract.

About two months after Barton entered upon the agency, the company, in reply to a request of his, wrote him as follows: "When here, you mentioned about thirty days acceptance; and after thinking of it, I now say, that in all cases have buyers remit by P. O. order, if possible, on delivery, as we prefer it in all cases; and do not mention thirty days acceptance, except in extreme cases; and be sure they are all good men." "Extreme cases," mentioned in this note, must mean, that the authority was not conferred, except in those cases where the thirty days indulgence appeared to be a condition of effecting a sale, to a financially good man: only in such conditions was the thirty days indulgence allowed to be given. Now, this was in no sense a contract, nor was it the modification of a contract. No promise, or other consideration, moved from Barton. It was one of the orders, or directions of the company; properly speaking, a parol license. Such license is always sufficient excuse for any act done under it while it is allowed to stand, but no longer. It can be revoked or modified at the will or caprice of him who grants it.—*Chambers v. Seay*, 73 Ala. 373.

On the 21st March, 1882, the company wrote to Barton as follows: "Your favor of 20th inst. received, and noted. In reply to your statement, that you do not guarantee any bills, and such was not contemplated in our contract, I will only say that, *henceforth, you will understand that you are not authorized to sell bills that you do not guarantee*, and that this has always been our understanding of the arrangement between us." The authority to sell on thirty days time being only a license, and not a contract, the company was authorized to modify it; and the order of March 21st, copied above, was so far a modification of the license previously given, as to take away Barton's right to sell on time, without himself becoming the guarantor of the payment.

It was contended by the appellee in the court below, and the contention is renewed here, that the refining company violated, and thus broke up the contract, in the spring of 1882, and thereby injured plaintiff, in this; that it deprived him of the opportunity of earning and realizing large profits, which he could have done, if permitted to continue in the agency. The company does not concede that it violated its contract; but it takes the position, that, if this issue should be determined against it, the damages claimed are of the class called speculative, can not be estimated with proximate certainty, and therefore can not be recovered, no matter how closely they may have followed the breach. The precise form of the argument

is, that no standard can be furnished for estimating such damages. In *Brigham v. Carlisle*, at the present term—a case not distinguishable from this on the point under discussion—the question was very carefully considered, and we reached the conclusion, that such damages depend on too many contingencies to be the subject of a recovery. We need not repeat the argument.—See, also, *Cin., Selma & Mobile Railway Co. v. Evans*, at the present term ; *Pollock v. Gantt*, 69 Ala. 373. In fact, the success of such enterprise depends on so many contingencies, that we can conceive of no means of making the necessary proof, on which to found a verdict. No rule for such ascertainment can be predicated. Past success in the same, or a similar enterprise, will not do. Conditions may not always remain the same.— *Washburn v. Hubbard*, 6 Lansing, 11 ; *Masterson v. Mount Vernon*, 58 N. Y. 391; *Lewis v. Atlas Mut. Life Ins. Co.*, 61 Mo. 534 ; 2 Wait's Ac. & Def. 443.

It results from what is stated above, that the judgment in this case must be reversed on many of the rulings.

The complaint and amended complaint contain many averments of breach, and there are many demurrers thereto. Some of the breaches are insufficient. We will not notice all the imperfections, but will call attention to some of them. These, with the principles declared above, will, we trust, furnish a sufficient guide for another trial. The following are imperfections in the original complaint : The first breach should have averred some amount of sales. The second breach should have averred that, when the alleged other agent was sent to Georgia to make sales, plaintiff was still performing the duties of agent under the contract, or was prevented from doing so by the wrongful act of defendant. The third should have averred some amount of sales, for compliance with which defendant failed to furnish oil. Assignments numbered $3\frac{1}{2}$, 4, 5, 6, 7 and 8, we need not specially comment on. The principles declared above will determine when, and to what extent, they need amendment. These remarks apply equally to amendments of the complaint, as shown in the record.

Extent of sales made by plaintiff was competent evidence, as tending to furnish a basis for fixing plaintiff's compensation for services he had rendered. It was not competent as affording a guide for estimating future or prospective profits. This was proper subject for a charge, explanatory of the extent of its admissibility.—1 Brick. Dig. 809, § 87 ; *Ib.* 810, § 98.

That part of the general charge which was excepted to, has a tendency to mislead. This will not reverse. Appellant should have asked an explanatory charge. The third charge given at the request of plaintiff should have been refused. In the charge given by the court of its own motion, the City

[Caldwell v. Smith.]

Court erred, in the following language : "If the evidence shows you [the jury] that the defendant did give the plaintiff such authority [authority to sell on time], and that while plaintiff was exercising the same defendant did not withdraw it, but informed plaintiff he would be required to guarantee all such sales, such requirement, if it embarrassed plaintiff in his operations, and prevented him from making sales, was a breach of contract." We have shown above that the authority to sell on time was a mere order, which the company was authorized by the contract to give, or, at most, a mere license. The company was not only authorized to revoke it, but could modify it at its pleasure. It was not a contract. If it had been, neither party could have rescinded or modified it without the concurrence of the other. Each would have been equally bound by it, or neither was bound.—*Cin., Selma & Mobile Railway Co. v. Evans*, at present term.

No one will contend that, under this license, Barton was compelled to sell on time ; or that, if he had refused to do so, it would have been a breach of his agreement. Not being bound himself, the company was not bound to continue the license any longer than it chose to grant it. It had authority to continue the license, to revoke it absolutely, or to modify it. When Barton was informed he would not be permitted to sell on time except on his own personal guaranty, he had a clear right to refuse to make credit sales on these terms. This order was no breach of contract on the company's part, and it conferred on Barton no right to treat the contract as broken by the company.

The sixth charge should not have been given, because it assumed as fact, without hypothesis, that Barton had kept, and was keeping his part of the contract, and that the company had been guilty of a breach on its part. The eighth charge is objectionable on the same ground.

Reversed and remanded.